Next case on today's, this morning's docket is the case of Lipe v. Lash, N.K.A. Covington, and we have Ms. Jane Longer for the appellant and Michelle Blackburn for the appellate. So, Ms. Longer, you may proceed. Uh-huh. May it please the court, counsel. I'm Jane Longer. I represent Forrest Lipe in a custody matter. Joey, the minor child, was born in 2002. He is 10 years old. Forrest had to file a paternity action in 2002 to obtain visitation with his son. In March of 2010, Allison, Joey's mother, met John Covington. In May of 2010, they moved in together. In June, they got married. In August, Allison filed for a divorce. They lived together for less than seven months. There were two 911 calls and two other known incidents of domestic violence. In early December, Forrest obtained an order of protection due to one of the 911 calls involved a loaded gun and alcohol. Attorney John Narmont has managed to drag this case out for nearly two years from the time he was filed until the last day of trial. The order of protection was in effect until November of 2012, which was the last day of trial in this matter. The last day in the order of protection for nearly two years, Allison and John Covington were not allowed to live together. John was not allowed to be there while the child or be anywhere near Joey until September of 2011, and then the protection order was modified to allow him to be there between 8 a.m. and 8 p.m. Judge Jarman dismissed the order of protection the last day of trial in November of 2012. However, he kept the restrictions against Allison in effect. No alcohol consumption 12 hours prior to or during the time that Joey is present in the residence. No guns allowed in Allison's residence. These restrictions were not placed on Forrest. In March of 2011, after this custody case in the order of protection was filed, Allison moved from the area. She moved to Litchfield. Litchfield is where she ended up finding all of her witnesses to testify for her at the trial. These people had known Allison for less than a year and a half. Allison's case consisted primarily of the last two years when the order of protection was in effect and when this custody case was going on. John, Allison, Forrest, and Forrest's wife Sandra are all approximately 30 years old. The trial court put little to no weight on their history. The trial court chose to speculate as to the future without considering the past. The saying is, those who ignore history are bound to repeat it. Now, concerning these known histories, I'd like to address some of the issues. Let's first talk about job history. Allison Covington. How long was having the hearing? How long was the hearing that you had there? 11 days of trial. And you had witnesses by 21 and 20 on the other side? We had over 50 witnesses in the 20s. I'm not certain of the exact amount. Allison Covington, her job history, she's never stayed at any job for any length of time. She's walked out on jobs without notice. She's age 30 and never in her adult life has she held regular employment. John Covington, very much like Allison, series of job hopping, fired for stealing beer, nothing shows he was ever able to hold a job for any length of time. His current job when he testified at trial he had been at for, I believe it was approximately 4 weeks. John was not employed from October of 2010 to the time, to just 4 weeks prior to him testifying at trial. Forrest Light, on the other hand, has a very strong job history. He has a bachelor's degree, an associate degree. He was employed with the Department of Corrections since 2004. He is also in the National Guard and received top secret clearance in 2007-2011. He received achievement medals in 2009-2010. He was nominated for Airman of the Year. He also holds a warrant authority to sign contracts on behalf of the U.S. government. Forrest has a history of dependability, stability, and maturity in his job history. He has testified that he would instill these work ethics in Joey. Sandra, Forrest's wife, she's a manager at a restaurant. Once again, there's no comparison. Forrest, Sandra versus Allison and John is like day and night. The next issue I'd like to address is the financial ability to support Joey. The trial foretold that this factor slightly favors Forrest. Allison has been dependent on her parents for housing, utilities, vehicle, babysitting, transportation for Joey, paying private preschool for Joey, supervising Joey while she was going through 20-30 different boyfriends over the years. For clothing, they financed and built a salon for her to work at, which she quit within a year. She depended on government welfare for a medical card, for a length card, for $430 a month for groceries, for a WIC card, WIC and help with her power bill. She depended on Forrest for child support. Now we're heading into a situation where she had one other child besides Joey at the time of the trial and she was pregnant and should have had the child by now. She's living in a two-bedroom apartment with her husband, John, and three kids. The only change now, after we filed this, the only change now is that she's depending on John Covington and John Covington's mother, child support from Forrest, and any public assistance she can get. Is there a child? Whose child is that? Well, Joey is Forrest and Allison's. Allison had another child, Willa, at the time of the trial and she's pregnant again. The Willa is whose child? That is Allison and John's. And then John's mother provides $300 to $400 a month in help to John and Allison. She testified that she buys groceries for them. She pays on their credit card debt. There are four days of trial left and she had testified that she paid between $70,000 to $80,000 in Allison's attorney fees for this custody case alone. Allison still does not have any job opportunities available to her. John Covington, he's the same. Still depends on his mother to help him pay his bill. He's never shown that he can take care of himself, let alone the family. In 2010, they filed joint tax returns at gross income of $11,800. Allison earned zero of that amount. In 2011, John and Allison purchased a vehicle for $17,000. A couple months later, they purchased another vehicle for $26,000, which they had to borrow the money for both vehicles. This was at a time when they were dependent on John's mother and the welfare system to provide them with the basic needs. It just, it shows immaturity. Forest Life, on the other hand, he has always paid his own way, paid his own bills, his own expenses, and supported his wife and children. He's never had to live off anybody and he's never had to ask for any welfare. I would say that this is not a slight difference, it's a profound difference. The next issue is the domestic violence and substance abuse. Allison and John lived together for under seven months. There were four known incidents of domestic violence. November 24th of 2010, there was an incident involving a loaded Beretta 9mm. John chambered around. Allison locked herself in the bedroom and she was upset, crying, and shaking. Allison texts two different friends asking them to contact 911. She told her friend that her husband brought a loaded gun to bed with them and she was not sure if he was going to do something stupid or crazy. And it makes you wonder, why did she text two friends? She had the phone, why didn't she just call him? Was she afraid that John was going to hear her talking on the phone and use that gun? That night, John did everything. He brought the loaded gun, live ammunition, chambered around. John Covington did everything that night but pulled the trigger. November 12th of 2010, Allison called 911 herself and said her husband was really drunk. He pushed her a few times and he's getting crazy. She said he got really mad and freaked out. She again locked herself in the bedroom. Ashley, one of Allison's friends, testified that she witnessed John grab Allison's wrist, throw it across the kitchen floor to the living room where she fell and hit her head. John was very angry, she said. When Allison tried to leave, John jumped on her car as she was driving. In November of 2010, John had a black eye. Allison told her mother that John was choking her and had her up against the wall and she had to punch him to get him off. Both John and Allison, once they got to court, they did tell different stories. Allison didn't remember about the black eye exactly but it had to do with the bowl. Alcohol played a role in most, if not all of these incidents. Both John and Allison are admitted alcoholics. John was hospitalized for three days after being picked up for a DUI. When I asked him why he was hospitalized, he refused to answer. John and Allison were both on antidepressants until 2012 when they were both diagnosed with ADHD and they were both put on Ritalin. At the time of trial, Allison had to be off Ritalin because of her pregnancy. Allison also testified when she was out drinking sometimes, she just didn't remember what she did. John and Allison went out at least four times a week. The short seven months that they lived together was on and off. It went from bad to worse. They were separated three to four times under that seven months, sometimes for two weeks at a time. Forrest, Forrest has never had the police call on him with Sandra. They've never had any domestic violence incidents. They've never been separated, never filed for a divorce. There's absolutely no alcohol or mental health issues with Forrest or Sandra. Now the court referenced the 2005 incident with Forrest between Forrest and one of Allison's boyfriends when Allison told him that she slept with both of them the same day. Forrest pled guilty to disorderly conduct in 2006. The trial court under this statutory factor only acknowledged three of these incidences and they said that this factor favored neither Forrest or Allison. They recognized three incidents of violence and that was the 2911 calls and then Forrest's disorderly conduct in 2006. However, the court still ordered that there was to be no drinking or guns in Allison's residence. So that leads us to believe that the trial court must have at least felt that there was a potential for future domestic violence between John and Allison. Allison's domestic violence and abuse of alcohol was atrocious prior to this custody case. It stopped during the custody case, but there's no guarantee it won't return once this case is behind it. The future of John and Allison on the part of the trial court is purely speculative. With regard to Joey's wishes, the expert, Donna Akerson, has questions specifically designed to find out if the child's been coached. The results of her questioning showed that Allison coached Joey, Forrest did not. Also, Joey denied that Allison and John were ever separated, even though the evidence showed while he was living with Allison they separated three to four times. Joey also told Donna that Allison used to be a nurse. This shows that Joey is not real reliable. The in-camera interview was on a Friday. Allison refused to let Forrest have Joey for his two days that week on Tuesday, Wednesday, or Thursday before his interview took place. The in-camera interview showed that Joey had been coached and promised things like going to Missouri hunting. It also showed that Allison was telling Joey things about the court proceedings. Allison had previously told Joey that Columbia, Missouri is the land of milk and honey and he needs to go to Columbia and would be better off in Columbia. John and Allison also discussed moving to Columbia, Missouri and this is where John's mother resides. What's our standard of review? Our state clerk convincing evidence of the best interest of the child. Here in this court, what's our standard for reviewing the trial court's order? It's a... Is it manifest way to the evidence? It is, I'm sorry. In other words, whether or not the trial court's factual findings against the manifest way to the evidence and then is it also whether or not his ultimate decision is an abuse of discretion? Correct. Okay. Yes. Basically, there should have been no weight put on Joey's wishes or very little weight. The next factor is the interaction of the child with persons who may significantly affect the child's best interest. The trial court said this favored Allison. However, the trial court failed to even consider Joey's relationship with Allison's extended family, which they were basically the primary caretakers of this child for the first eight and a half years of his life. You have the opportunity for rebuttal. Thank you. Mm-hmm. Ms. Blackburn. May it please the court. Counsel. My name is Michelle Blackburn. I'm the appellate counsel for respondent Allison Covington in this cause that's before the court. This case, Your Honors, is about what is in the interest of a 10-year-old boy, Joey Lighton. Joey has been in sole custody of his mother since his birth and has had visitation with his father since shortly after his birth. The decision that's being appealed from in this case is the decision that denies Mr. Lighton's petition for custody of Joey. And it is important to remember in this case that the circuit court heard extensive testimony concerning the issues raised in Forrest's petition. This included the testimony of two child psychologists, a doctor, teachers, friends, police officers, and family members. Forrest called, in answer to your question, approximately 29 witnesses in support of his petition, and Allison called approximately 25 witnesses to stand in defense of the petition to change custody. Your Honors, in Ray and Mary Gibalter, which is a case from this district, held that in these type of cases there is a legislative presumption in favor of the present custodian and a policy favoring the finality of child custody judgments. So once a court concludes that a change is necessary, great deference must be accorded to that decision since the trial court is in the best position to judge the credibility of the witnesses and to determine the needs of the child. In this order written by Judge German in this case, he outlined in specific detail the statutory factors that he evaluated and what weight he gave to each one of those statutory factors that are contained in 602A. For Forrest's position, or Mr. Lighton's position, first he objects to the court's order because it ignores the recommendations of both parties' child custody evaluators. It is well settled in the Illinois Appellate Court that a court has no obligation at all to rely upon the recommendations of the parties' custodial evaluators. Rather, it is the duty of the court, not the evaluator, to determine what's in the best interest of the child. Next, Forrest objects to the way in which the court considered the statutory factors in this case. So this is not a case where Forrest alleges that the court misapplied the law, but rather, I'm sorry, where it didn't follow the law, but rather where he believes Judge German actually misapplied the law in this case. First, Your Honors, with regard to the wishes of the child's parent, the court correctly determined in this case that both of the parents wished to be awarded custody of Joey and that each parent's wish was based upon what he or she believed was in the best interest of Joey. Forrest incorrectly states in his brief that the court improperly looked at the best interest of Allison because the court made specific mention of the fact that Allison is currently estranged from her family and stated that he understood, based upon everything that he had heard, why she was estranged from her family at this point in time. Next, Your Honors, with regard to the wishes of the child, Joey is 10 years of age, so we are not dealing with a young and immature child. He spoke to two custody evaluators and spoke to the judge as part of an in-camera interview. His desire to reside with his mother was unwavering. He not only expressed this desire to both of those custody evaluators, but he also expressed that very clearly to Judge Jarman. He was described, Joey, was described by no fewer than 12 witnesses, called by both his mother and his father as smart, friendly, happy, playful, likable, good student, well-behaved, athletic, polite, and these didn't include simple character witnesses called to either support Ms. Covington or Mr. Light, but these included teachers, these included his diocesan physician, these included the principal at his former school, and so there was substantial evidence as to the kind of child that Joey Light is. The court subjects to the court's analysis under the statutory factor of wishes of the child for two reasons. First, he alleges that there was parental coaching. I suggest to the court that there was no evidence of parental coaching as alleged by Forrest. In support of his allegation, he says that Allison was told by Joey, or told Joey, I'm sorry, that he could not go hunting in Missouri because of the court situation. He also indicates that Allison told Joey how great Columbia, Missouri was. And then finally, he indicates that Joey told the child psychologist that he was supposed to tell her that he wanted John to be able to spend the night so he could do more fun things. There's no evidence that Allison made any of these statements to Joey in an effort to get Joey to make statements to the court in her favor or to the custody evaluator in an effort to get Joey to make statements in her favor. Finally, what's interesting about this custody evaluation and what Ms. Longer indicated with regard to Ms. Atkerson's evaluation is, from what I read in the custodial evaluation, it was one question. And the question was, and it's important to remember, Joey came with Allison first to the custodial evaluation and accompanied Forrest at a later time. The question was, is there anything that you were supposed to remember to tell me when you got here? Not, did your mom tell you to tell me anything? Did your dad tell you to tell me anything? Just a simple statement, is there anything that you were supposed to tell me? And then Dr. Atkerson, at least from her custodial evaluation, never follows up on the information that was provided to Joey by saying, well, who told you to tell me that? Did your mom tell you to tell me that? Did your dad tell you to tell me that? There was no investigation by Ms. Atkerson either as to when's the last time you saw your father. Obviously, your mother brought you here, so you were just with her. But in the context of when this actual meeting took place, we don't know. Was he just with his father and his mother picked him up and brought him down to the evaluation? Or had it been some sort of substantial period since he last saw his father? Your Honor, I would suggest to the court, if in this case there was parental coaching, it was on the part of Mr. Light and his witnesses. Joey told the court during his interview that Pat Lash, his maternal grandmother, promised him an Xbox if he lived with his dad, and that his father promised him a bunk bed if he lived with his dad. Your Honor, I think it's also important to note that Ms. Atkerson, in her summary, in her custodial evaluation, made no finding of any sort of parental coaching. As a matter of fact, made no mention at all of parental coaching throughout her entire evaluation. And in addition to that, Judge Jarman made no indication that he felt like this child had been coached. The second argument made by Mr. Light is that he does not believe that Joey's wishes should have been considered. And of course, Your Honor, this argument is fundamentally flawed for two reasons. First, it's one of the statutory factors to be considered by the court. And second, there is Illinois case law that is clear in holding that a mature child's preference is to receive considerable weight when it's based upon sound reasoning by the child. Joey gave well-thought-out reasons for wanting to continue to live with his mom. He told the court that he and his stepfather do lots of things together and get along really well. His friends live in Litchfield. He would not be able to play sports in Litchfield if he were to live with his father. And that his mother was taking care of him his whole life. That's what he told Judge Jarman. Your Honors, the next factor is the interaction of the child with his parents, siblings, or any other person who may significantly affect the child's best interest. The court, under this factor, specifically noted the close relationship between Joey and Allison, calling Allison, and I quote, by far the person closest to Joey his entire life. The overwhelming evidence in this case supported the fact that Allison was the primary caregiver and sole custodian of Joey since his birth. There was evidence, Your Honors, that Ms. Covington's parents provided babysitting care for Joey because for a substantial period of time, I think up until the time maybe Joey was five, Allison and Joey lived in her parents' residence. There was evidence from teachers and the principal that Allison was very involved in Joey's life at school as a room mother, as a volunteer, and as an overall concerned parent. Allison was described by her friends as a good mother who listens to Joey, loves doing things with him, and is very caring and concerned about Joey. Even Allison's own sister, who was called by Mr. Light, testified that Allison is a good mother and she does not believe that Allison would do anything to harm Joey. The only evidence in this case, Your Honors, contrary to the fact that Allison is a good mother who can take care of Joey and has been taking care of Joey, was self-serving testimony of Allison's mother, Allison's father, and Allison's brother. Allison's mother, Pat Lash, has played a very significant role in the life of Allison and Joey and Mr. Light since Joey's birth. And some would say she was an overly involved grandmother who sought to control Allison and Joey. The principal at Beckmeyer School, which was Joey's previous school and a school where Ms. Lash taught or teaches, I believe still, had received complaints from Allison about her mother's interaction with Joey at school and was asked to intervene on behalf of Joey to resolve that issue. The issue was she was going to the cafeteria every day, sitting with Joey while he had lunch, opening his lunch for him, and it made Joey uncomfortable to be put in that predicament. There was also testimony from Allison's childhood friend, not a friend she recently had, but a childhood friend who testified that Ms. Lash would tell Allison what she needed to do and how she needed to do it. And from another friend, again another childhood friend of Allison's, there was testimony that Ms. Lash would show up at Allison's home unannounced and that she would get upset when Allison would ask her to leave. Finally, a completely independent witness, a gentleman by the name of Christopher Kaiser, testified that Ms. Lash was a contentious woman who always had a comment. In addition to noting the good relationship and the significant relationship between Joey and his mother, the court also noted the good relationship that Joey has with his sister, Willa, who is Allison's child with her current husband, John, as well as the good relationship that he has with his stepfather, John. John's relationship with Joey was described in testimony as follows. He loves the child as if he were his own, and I believe that Joey loves him the same way. The relationship was described as fun-loving, respectful, and obedient. It was described as fun by John's mother, who was also noting that they're good friends, but they have boundaries. And finally, the soccer coach, or soccer mom, if you will, who had become close to Joey and Allison since they had relocated to Litchfield, testified that John helped out with soccer and baseball, and she could tell from the development of Joey's skills that John had been working with him at home. The court did not fail to acknowledge the good relationship between Forrest and Forrest's wife and Forrest's son with Joey. However, the court did acknowledge that Forrest has not been as involved in Joey's life as Allison has been because of his work schedule, because of his visitation schedule, and because of his multiple military employments since Joey's birth. Forrest's visitation schedule since Joey's birth has been every other week on the two days that he is off work, and two days each week for three hours each. Currently, Forrest's days off are Tuesday and Wednesday, which means when Joey is in school, his visitation schedule is from after school until bedtime on those days every week. Forrest argued that this factor, this interaction with family and other members, siblings and parents, weighed in his favor because Allison is estranged from her family. And as I said previously, the court indicated that it understood, based upon what it had heard, the reasons for that estrangement. And Allison's own sister testified that if she were in Allison's position, or if her parents were trying to take her child from her, she would not trust her family either. Forrest cites the Stone case for the proposition that Allison should not be allowed to distance herself from the family because of problems with that. However, the Stone case is not applicable here. The Stone case involved two parents who were fighting for custody and a mother who had up and removed the child from Illinois and went to Florida with the child and then was doing everything she could to distance the child from the father. That is not the case here. Forrest has all of the visitation rights that he has always had. The only estrangement in this case involves Allison and her family, her mother, her father, and her brother. Furthermore, Your Honor, there is no evidence, there was no evidence presented. Your Honor, very briefly, in closing, I would just say that the court heard a substantial amount of evidence in this case, weighed that evidence, and determined that Forrest Light's petition should be denied. We're asking this court to affirm that decision from the court. Thank you. Thank you, Ms. Blackburn. Do you have rebuttal, Ms. Blackburn? Donna Akerson did state in her report that there was an indication that Joey had been coached by Allison. With regard to Joey being a mature child, he's 10 years old, Allison builds John up in front of Joey. There is testimony that Allison calls Forrest a dirty Mexican in front of Joey. John calls Forrest a douche in front of Joey. John tells Joey that he's more of a dad than Forrest will ever be. Forrest, on the other hand, three months after he had to go to court to take Joey to his wedding, because Allison wouldn't let him, he voluntarily gave Allison Joey for her wedding on his weekend. Forrest has photos of Joey and Allison in Joey's bedroom. He has never said anything negative about Allison or John in front of Joey. Now, the vast majority of Allison's witnesses knew her for one and a half years, the past one and a half years, the entire time during this custody case. Forrest's witnesses knew him for a lifetime, a lot of them, since he was in second grade. The mere fact that Allison had to move from the area and find new friends and acquaintances during this custody case tells us all we need to know about Allison. The trial court ignored John and Allison and Forrest and Sandra's history. The bottom line here is neither of the experts nor anyone that has known Allison before this custody case began recommended that she get custody of Joey in this action. What is going to go on, what is going to happen with Allison and John when this case is over? It's all speculation. We know, we have a history of what happened when they were together for less than seven months. What is going to happen when this case is over and the spotlight isn't on them and they're not being watched as closely? No one knew Allison better than her grandparents, her grandmother, her parents, and her siblings. Now, their entire extended family are productive, mature, reliable members of the community. Allison, her family could have kept seeing Joey. All they would have had to do was say, yeah, Joey is better off with Allison than Forrest. That entire family loved Joey. They wanted to protect him. They tried to protect him. Joey's grandma even said, I knew this might cause me not to be able to see Joey again, but as a grandmother, I want to protect my grandson. And that's why I'm here testifying on behalf of Forrest. Allison had to run from her entire past history and find witnesses that would tell it the way she wanted it told in court. Forrest has taken all of his visitation with Joey. He was deployed. There was testimony he will not be deployed at long times again. But even during his deployment for 60 days, 80 days, and I believe the other one was approximately 100 days in the past before this custody case started, Allison refused to let Forrest's mother even have any contact with Joey. Allison is not going to cooperate or try to facilitate a good relationship between Joey and Forrest. She never has, and she never will. However, Forrest has showed in the past that he's tried to facilitate a close and loving relationship between Allison and Joey. This child needs both parents. He needs to be with Forrest. I think all of the statutory factors favor Forrest. What happens when John and Allison break up? Allison is going to be on the street with three kids, with nobody to support her, nobody to help her. Donna Akerson had said that she's dependent. She transferred her dependency from her mother to John Covington. What is going to happen if that relationship ends? If Forrest and Sandy's relationship ends, Forrest is still going to provide for Joey. He's still going to live in the same house. He's still going to be able to physically and mentally provide for Joey. The stability adjustment to homeschool and community, I'd just say quickly, compare Allison and John's marriage with Forrest and Sandra's marriage. Where is this child going to be more stable? Donna Akerson tested both parties. Allison's IQ was in the 30th percentile, Forrest's in the 77th percentile. Donna stated that Forrest was better able to support Joey academically, emotionally, stability-wise, and social functioning. The parental fitness testing, Forrest had 76% compared to Allison's 21%. Thank you. Thank you. Thank you both for your briefs and arguments.